IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TODD D. NELSON,

                              Plaintiff,                          OPINION AND ORDER

        v.                                                        20-cv-585-wmc

NORTH CENTRAL STATES REGIONAL
COUNCIL OF CARPENTERS' PENSION
FUND,

                              Defendant.

In July of 2006, plaintiff Todd Nelson sustained an injury to his neck while lifting tiles at work. Since that date, he has been unable to earn more than $8000 per year, and three doctors have found him to be permanently disabled. In 2017, after discovering he might be eligible due to his two decades of contributions, Nelson also submitted a benefits application to defendant North Central States Regional Council of Carpenters' Pension Fund ("North Central"). At the initial level, the Trustees concluded Nelson was eligible for both prospective and twelve months of retroactive disability benefits. On review, however, the eligibility committee decided that Nelson was owed no more than twelve months of retroactive disability benefits. As for any prospective right, the committee found Nelson was ineligible, including for unreduced early retirement benefits. At the final level of review, North Central's executive committee affirmed that Nelson was owed no more than twelve months of retroactive disability benefits without expressly addressing his claim for unreduced early retirement benefits.

Plaintiff subsequently filed this lawsuit, claiming that North Central wrongfully denied Nelson's claims for unreduced early retirement benefits and disability benefits in

violation of § 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA") (codified at 29 U.S.C. § 1132(a)(1)(B)).  In response, defendant counterclaimed, seeking to walk back any payments made based on their initial determination that Nelson was owed prospective disability benefits and requesting their repayment.  Now pending before the court is defendant's motion for judgment on the administrative record and plaintiff's motion for summary judgment.  For the reasons discussed below, the court will enter judgment against plaintiff on his claim for an award of additional, retroactive disability benefits, but will otherwise grant his requested relief for unreduced early retirement benefits.  Finally, for the same reasons, the court will dismiss defendant's counterclaim.

UNDISPUTED FACTS[1]

**A.  The Plan**

Nelson was a participant in the North Central States Regional Council of Carpenters' Pension Fund Pension Plan ("the Plan").  Contributions were last paid to the Fund on Nelson's behalf on July 31, 2006.

---

[1] The following facts are considered material and undisputed for the purposes of this opinion based on the administrative record as previously supplemented.  *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 761 (7th Cir. 2010).  Specifically, the court grants the parties' stipulation to supplement the administrative record with copies of Nelson's medical records.  (*See* Stip. to Supp. Admin. Record (dkt. #16).)  The court will also consider the Plan's "summary plan description" ("SPD") to be a part of the administrative record.  To the extent the Plan conflicts with the SPD, defendant's only objection is that the Plan controls.  Even if true, this is no argument to exclude the SPD entirely from the administrative record.  *See Pettaway v. Tchrs. Ins. & Annuity Ass'n of Am.*, 644 F.3d 427, 433 (D.C. Cir. 2011) ("Far from being an irrelevant piece of human resources material, the Summary Plan Description is the ERISA-mandated, plain-language document upon which plan participants may rely to understand their benefits.").  Thus, the administrative record in this case includes the record compiled by North Central (AR vol. 1 (dkt. #14); AR vol. 2 (dkt. #15)), Nelson's medical records (AR vol. 3 (dkt. #17)), and the summary plan description (AR vol. 4 (dkt. #24-3)).

The Plan grants discretion to the Trustees to construe and interpret the Plan. Article VII addresses claims for total and permanent disability benefits.  Under Section 7.1, total and permanent disability benefits are payable when: the participant has ten years of continuous service immediately preceding his total and permanent disability; the total and permanent disability occurs within 24 months of the last month for which contributions were payable to the fund on the participant's behalf; the participant applies for benefits, submitting satisfactory evidence of his disability; and the Trustees approve the application.

Section 7.2, defines "Total and Permanent Disability" as:

> physical or mental condition of a Participant which the Trustees, in their sole judgment, find on the basis of medical evidence, totally and permanently to prevent such participant from engaging in any regular occupation or employment for remuneration or profit and which, within reasonable medical probability, will be permanent and continuous during the remainder of his life.

(AR vol. 1 at 173.)  The Plan itself does not provide a definition of what constitutes "employment for remuneration or profit" for purposes of Section 7.2; however, the Summary Plan Description ("SPD") provides that a participant engages in employment for reasonable remuneration or profit if his income equals or exceeds 2,080 hours of wages at the federal minimum wage.  Section 7.2 further provides that the Trustees may in their discretion accept a Social Security award of disability benefits as evidence of total and permanent disability.

A participant may apply for early retirement benefit (reduced or unreduced) upon reaching the later of age 55 or his tenth anniversary of participation in the Plan.  Moreover,

a participant may receive *unreduced* early retirements if he has twenty years of continuous service immediately preceding his retirement and is determined to be totally and permanently disabled at the time he applies for an early retirement benefit, provided the total and permanent disability occurred within 36 months of the last month for which contributions were made on his behalf.  To be eligible to receive early retirement benefits, he must have "applied for an Early Retirement Benefit on a form prescribed by or satisfactory to the Trustees," and further, the Trustees must have approved the application.  (AR vol. 1 at 153.)  If the Trustees approve an application for disability benefits, the Plan also contemplates approval of retroactive benefits of not more than twelve months of retroactive payments are to be made, except that a greater award may be given if the Trustees "in their discretion, determine the circumstances warrant it on a case by case basis."  (AR vol. 1 at 177.)

On the other hand, if an application is denied in whole or in part by the Trustees, the Plan permits participants to request a review by the eligibility committee.  Additionally, a participant may request further review of the eligibility committee's determination by the executive committee.  The Plan requires the executive committee to render a decision within 60 days after receipt of the written request for further review, except for disability claims, which are to be rendered within 90 days.

## B.  Nelson's Medical History

Nelson suffers from a variety of medical conditions, including degenerative disc disease, arthropathy, fibromyalgia, and hypertension.  In 1999, Nelson underwent a C6-C7 cervical spine fusion to treat chronic neck pain secondary to a work-related injury.  As

4

previously noted, Nelson suffered another injury at work on July 11, 2006, while lifting tiles as a part of his job as a ceiling installer.  About a week after his injury, Nelson met with his primary care physician, Jeffrey Kiel, M.D., complaining of pain and tingling that radiated down the right side of his back and into his leg, limited range of motion, and diffuse tightness and tenderness of paraspinous muscles.  An x-ray and MRI confirmed a new, prolapsed disc at C7-T1 contacting a nerve.  On July 25, 2006, therefore, Dr. Kiel limited Nelson to only sedentary work with restrictions on neck movement.

At an August 18, 2006, follow-up appointment, Dr. Kiel advised that "[Nelson] should not work in the field at this time, esp[ecially] looking up at the ceilings as this will only make his herniations worse."  (AR vol. 3 at 32.)  On October 12, 2006, Dr. Kiel reiterated that Nelson could only work in a sedentary capacity, and because of Nelson's recurrent neck problems, further stated that he could not do a significant amount of looking up or working with his arms over his head.  Dr. Kiel also limited Nelson to lifting no more than ten pounds and seldom lifting above mid chest.

At the end of December of 2006, Nelson began physical therapy with Melissa Roswold, P.T.  Physical Therapist Roswold noted that Nelson had "significant left upper extremity symptoms" and "extensive cervical spine degeneration" that limits his "functional activities such as sitting, standing, and sleeping."  (AR vol. 3 at 73.)  Despite attending twice weekly physical therapy throughout 2006 and into 2007, Nelson continued to struggle with neck pain.

Dr. Kiel then referred Nelson to Mark Moore, M.D., in occupational medicine, who met with Nelson on May 11, 2007.  Dr. Moore concluded after an examination that Nelson

should be subject to the following permanent restrictions:

> He should have a 10-pound occasional lift restriction, should
> have a restriction for no repetitive motions of the neck, and
> absolutely no backward extension.  Pushing and pulling should
> be limited to 25 pounds. . . .  He can occasionally bend, squat,
> or twist, and crawling should be seldom.  No lifting above mid
> chest.

(AR vol. 3 at 117-19.)  In particular, according to Dr. Moore, Nelson was "not capable of doing his old job."  (AR vol. 3 at 117-19.)

During an appointment with Dr. Kiel in June of 2007, Nelson also reported that he could no longer work as a ceiling tile installer, and he would love to work at Central Ceiling in an administrative capacity, but management was not willing to offer him a position. During an October 18, 2007, appointment, Dr. Kiel reported that Nelson was "desperate and near tears" and that Nelson "clearly would like to return to work but physically cannot."  (AR vol. 3 at 142.)

A number of years later, in July of 2012, Dr. Kiel again saw Nelson, observing that his physical condition had deteriorated further between 2010 and 2012, and in a subsequent appointment on October 28, 2013, Dr. Kiel once again noted that Nelson's symptoms were much worse.  Since conservative measures had obviously failed to relieve his pain, Nelson was deemed a candidate for surgery at that time.  However, this could have entailed the removal the old anterior cervical plate and a new anterior cervical discectomy and fusion, and Nelson never underwent that surgery.  According to Nelson, he turned down surgery after losing his job, although defendant disputes that joblessness

played any role in his decision to forego the surgery.[2]  Regardless, Dr. Kiel concluded, "it does not appear that [Nelson] can achieve gainful employment and will likely have chronic neck pain even if he undergoes surgery."  (AR vol. 3 at 317.)

## C. Nelson's Work History

After his time as a ceiling tile installer, Nelson returned to working as a carpenter, having joined the North Central States Regional Council of Carpenters, Local 314 Union way back in 1984.  However, Nelson's last work as a carpenter ended in July of 2006.  From that date until 2012, Nelson did not work in any capacity and had no annual income.  Still, other than asking his old employer Central Ceiling for an administrative position, there is no evidence in the record that Nelson searched for sedentary or office employment of any kind between 2006 and 2009.

From approximately 2012 until 2017, Nelson was able to work in a limited capacity for the family business.  Specifically, Nelson would drive and "call[] on the phone" for that business (AR vol. 1 at 14), although the parties dispute how much Nelson earned while doing this.  Plaintiff points to Nelson's tax returns, which show that his gross earned income was:  $4,001 in 2012; $5,357 in 2013; $3,191 in 2014; $4,388 in 2015; $4,307 in 2016; and $2,288 in 2017.  In contrast, defendant points to an "annual verification of earned income" form in which Nelson handwrote his earning actually were:  $12,940 in 2013; $5,275 in 2014; $7,745 in 2015; and $8,119 in 2018.  Still, there is no dispute that

---

[2] The underlying record states that:  "Consideration was given to another surgery at that time, but he lost his job due to inability to function at work.  Unfortunately, he was not able to have this corrected and has been jobless ever since."  (AR vol. 3 at 317.)

Nelson never earned income equaling or exceeding 2,080 hours' wage at the applicable federal minimum wage after stopping full-time work in July 2006, and since 2017, Nelson has neither worked nor earned money in any capacity.

### D. Nelson's Applications for Disability Benefits

After Nelson received a letter dated May 26, 2017, advising him of his potential eligibility for disability benefits under the Plan, as well as providing instructions regarding the application process.  The following month, Nelson submitted a completed form, titled "Application For Disability Benefits."  (AR vol. 1 at 2.)  Further, defendant's Pension Analyst, Brock Wright, advised Nelson via letter dated June 26, 2017, that his request for a disability benefit would be reviewed by the Plan's eligibility committee on July 12, 2017.

In July of 2017, Nelson also applied for Social Security Disability Insurance ("SSDI") benefits through the Social Security Administration ("SSA").  In applying for those benefits, Nelson amended his alleged onset date to July 2017, so that he would be considered "an individual of advanced age on the established disability onset date."  The Trustees reviewed Nelson's disability benefits application at their July 12, 2017, eligibility committee meeting, but they delayed rendering a decision until after the SSA determined Nelson's eligibility to receive SSDI benefits.

Phone logs show that Wright next spoke with Nelson on August 22, 2017, although here, too, the parties dispute what information was communicated during this call.  According to plaintiff, Analysis Wright advised that Nelson would be eligible to receive an unreduced, early retirement benefit if he submitted medical examination reports indicating his disability.  In response, Nelson did submit four such reports to the fund, although

8

defendant objects on the grounds that these facts were drawn from a letter written by Nelson's counsel, and so are inadmissible hearsay.

Regardless, the parties agree that Nelson did eventually submit medical evaluation reports to the fund, and all four of these reports -- two of which were completed by Dr. Kiel, one was completed by James Nettum, M.D., and one by Mandira Mehra, M.D. -- certify that Nelson was in fact permanently disabled within the meaning of the Plan, effective July of 2006.  As discussed above, Dr. Kiel in particular had treated Nelson for a number of years, and in his August 8, 2016, Medical Examination Report, Kiel expressly finds the nature of Nelson's disability to be "severe neck pain" due to arthritis, weakness of the right arm due to nerve damage, and back pain.  (AR vol. 1 at 18-19.)  Dr. Kiel's June 16, 2017, Medical Examination Report also explains that the nature of Nelson's disability is "chronic severe neck pain" with limited range of motion.  (AR vol. 1 at 58-59.)  Similarly, Dr. Nettum established care with Nelson on October 30, 2017, and in his February 23, 2018, Medical Examination Report, he also notes the nature of Nelson's disability to be "chronic severe neck pain" with limited range of motion.  (AR vol. 1 at 16-17.)  Finally, Dr. Mehra appears to have examined Nelson for the first time on January 31, 2018, and concluded that he was permanently disabled due to "chronic neck pain," lumbar radiculopathy, and myofascial pain on February 20, 2018.  (AR vol. 1 at 20-21.)  Finally, while the Social Security Administration concluded on December 31, 2018, that Nelson had the residual functional capacity to perform light duty work with additional exertional limitations, it also ruled that given his age, education, and work experience, Nelson was certainly disabled within the meaning of the Social Security Act.  Nelson further provided

a copy of this decision to the Trustees in January of 2019, causing them to consider once more Nelson's application for disability benefits at their March 13, 2019, meeting. That same day, the Trustees informed Nelson of their decision to approve his claim for disability benefits by letter dated March 13, 2019.

Specifically, the Trustees approved Nelson's disability benefits in the amount of $200 per month. Additionally, the Trustees further awarded Nelson retroactive disability benefits dating back to June 1, 2016, which was 12 months before his disability benefits application. Accordingly, Nelson received a lump sum payment for $7,000 for retroactive disability benefits via check dated April 1, 2019. In calculating Nelson's retroactive disability benefit amount, the Plan utilized a "disability date" of August 1, 2006.[3] As noted, however, the Trustees' March 13, 2019, letter did not even mention Nelson's right to unreduced early retirement benefits.

By letter dated September 9, 2019, Nelson through counsel requested that the eligibility committee review the Trustees' decision, in particular: (1) asking the committee to approve additional retroactive disability benefits to his alleged disability date of July 2006; and (2) stating that "by this letter, Mr. Nelson claims Unreduced Early Retirement Benefits, given he is totally disabled." (AR vol. 1 at 31.) The eligibility committee responded to Nelson's request for review via letter dated October 10, 2019, denying payment of any additional, retroactive disability benefits and acknowledging that "[y]ou

---

[3] This calculation was apparently made in June of 2017, which was almost two years before the Trustees' ultimate determination that Nelson qualified for disability benefits. Nevertheless, the calculation reflected a determination that Nelson should have received $200 per month, which was the amount ultimately awarded. Thus, there is no indication that the retroactive amount was ever adjusted, nor more specifically, that Nelson's "disability date" was ever changed.

have submitted a claim on behalf of Mr. Nelson for Unreduced Early Retirement Benefits."
(AR vol. 1 at 37.)  However, the committee wrote that it had "[e]xercised its discretion to
recognize the date the Social Security Administration found Mr. Nelson to be totally and
permanently disabled under their rules (July 18, 2017) as his disability date with the
NCSRCC Pension Fund," and further "[a]s a consequence of this decision, Unreduced
Early Retirement Benefits are not payable since Article IV, Section 4.3(h) of the Plan
requires in part that the Total and Permanent Disability must have occurred within 36
months of the last month for which contributions were payable to the Fund."  (AR vol. 1
at 38.)

By letter dated December 9, 2019, Nelson then requested the Plan's executive
committee to further review these claims.  Specifically, Nelson's counsel wrote:

> We represent Todd Nelson regarding his claim for Disability
> Benefits and Unreduced Early Retirement Benefits . . . .  [T]he
> Fund should approve his Disability Benefits retroactive to July
> 2006.  Likewise, the Fund should award Unreduced Early
> Retirement Benefits . . . because Mr. Nelson's Total and
> Permanent Disability occurred within 36 months of the last
> month for which contributions were payable to the Fund.

(AR vol. 1 at 39.)  In that latter, counsel also provided the Trustees with complete copies
of Nelson's medical records from 2006 through 2020.  However, after meeting on January
16, 2020, the executive committee upheld the committee's decision to deny Nelson's
request    for    additional    retroactive    disability    benefits.
While offering no reasoning for their affirmance of the committee's decision, other than
citing to provisions of the Plan, the executive committee did *not* even address Nelson's
request for further review of his claim for unreduced early retirement benefits.

OPINION

In the suit, plaintiff challenges both defendant's denial of additional, retroactive disability benefits and unreduced early retirement benefits under ERISA § 502(a)(1)(B). Presently before the court are the parties' cross-motions for judgment.  Plaintiff's motion is brought under Federal Rule of Civil Procedure 56, which requires he show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In rendering this ruling, the court must view all facts and draw all inferences in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  In contrast, defendant seeks judgment on the administrative record under Federal Rule of Civil Procedure 52.  (Def.'s Mot. (dkt. #18); Def.'s Reply (dkt. #32) 2 (confirming that its motion should be decided under the Rule 52 standard).)  Such a motion essentially functions as a request that the court decide the case as a bench trial on the administrative record.  *Hess v. Hartford Life & Acc. Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001); *see also Patton v. MFS/Sun Life Fin. Distributors, Inc.*, 480 F.3d 478, 484 & n.3 (7th Cir. 2007) (explaining the distinction between Rule 52 and 56 motions in an ERISA case).

At the outset, the court need only briefly address plaintiff's claim for retroactive disability benefits.  In seeking a Rule 52 judgment against plaintiff as to this claim, defendant contends that its decision allocating only twelve months of retroactive benefits was well within its discretion as the plan administrator.  (Def.'s Br. (dkt. #19) 8-13.)  In response, plaintiff explains that he is no longer seeking an order for *additional* retroactive benefits in his own summary judgment motion and asserts that the court need not consider

12

this issue.  (Pl.'s Opp'n (dkt. #27) 3-4.)  However, as defendant points out, plaintiff has not amended his complaint to eliminate this claim, and his failure to respond to this portion of its Rule 52 motion which he bears the burden of proof compels judgment against him.  Accordingly, defendant's motion will be granted as to plaintiff's claim for any additional retroactive disability benefits.

This leaves plaintiff's claim for wrongful denial of unreduced early retirement benefits, on which both parties seek judgment.  Beginning with plaintiff's motion, the court concludes that he is entitled to summary judgment for the reasons explained below. Because plaintiff prevails even under the "more demanding" Rule 56 standard with all inferences drawn in defendant's favor, *Hess*, 274 F.3d at 461, the court must necessarily deny defendant's cross-motion under Rule 52.  Finally, although neither party has moved for judgment as to defendant's remaining counterclaim, the court's ruling effectively resolves that claim, as well as for reasons addressed at the end of this opinion.

## I.  Claim for Unreduced Early Retirement Benefits

### A.  Whether Nelson Submitted a "Claim"

ERISA authorizes a plan participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  ERISA § 502(a)(1)(B) (codified at 29 U.S.C. § 1132(a)(1)(B)).  Typically, for this reason, the analysis of an ERISA claim starts out with a discussion of the appropriate standard of review applicable to the plan administrator's decision.  In this case, however, a threshold

question must first be addressed:  whether Nelson ever actually submitted a claim for unreduced early retirement benefits, since an employee's "claim" for benefits triggers ERISA's claim procedure.  *See* ERISA § 503 (codified at 29 U.S.C. § 1133 ("[E]very employee benefit plan shall (1) provide adequate notice in writing to any participant or beneficiary whose *claim for benefits* under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and (2) afford a reasonable opportunity to any participant whose *claim for benefits* has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.") (emphases added).  If Nelson never submitted a claim for benefits, then arguably there has been no denial of benefits for the court to review.

In the first of a series of oddly inconsistent arguments for a plan administrator with a fiduciary duty to its participants, defendant initially contended that the administrative process was "non-existent" because Nelson did not actually apply for early retirement benefits, and, therefore, the Trustees had no obligation to issue a determination as to his eligibility.  (Def.'s Opp'n (dkt. #19) 14-15.)  The implication of this argument is that Nelson never submitted a claim for benefits sufficient to trigger the ERISA process.  In its reply brief, however, defendant specifically *concedes* that Nelson submitted a "claim" for unreduced early retirement benefits under ERISA, but maintains that he did not submit a "proper benefit application" as required by the Plan to be considered eligible for those benefits.  (Def.'s Reply (dkt. #32) 6-7.)

This "distinction" appears to have arisen out of defendant's or its counsel's attempt to work around the fact that the eligibility committee expressly acknowledged Nelson's

14

submission of a "claim" for unreduced early retirement benefits in its October 2019 letter. (*See* AR vol. 1 at 37 ("You have submitted a claim on behalf of Mr. Nelson for Unreduced Early Retirement Benefits.").)  Whether or not there is any meaningful distinction between a "claim" for benefits under ERISA and a "proper benefit application" under the Plan,[4] defendant has plainly waived any argument that Nelson failed to establish the former, and so the court will proceed based on his having asserted a proper claim for unreduced early retirement benefits, duly triggering the ERISA process.

### B.  Standard of Review

Having disposed of this threshold issue, the court turns to the proper standard of review to be applied to North Central's denial of Nelson's claim for benefits.  The general rule is that a denial of benefits challenged under ERISA "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  In such a case, the court must review that decision under an "arbitrary and capricious" standard.  *Id.*  However, when an administrator fails to render a decision in compliance with ERISA timing regulations, the standard of review reverts back to de novo.  *Fessenden v. Reliance Standard Life Ins. Co.*, 927 F.3d 998,

---

[4] The implementing regulations to ERISA provide that "a claim for benefits is a request for a plan benefit or benefits made by a claimant in accordance with a plan's reasonable procedure for filing benefit claims."  29 C.F.R. § 2560.503-1(e).  Here, the Plan provides that a participant must apply "for an Early Retirement Benefit on a form prescribed by or satisfactory to the Trustees."  (AR vol. 1 at 153.)  At minimum, this would certainly suggest that a proper claim under ERISA with the Plan's reasonable application procedures are closely connected.

1001 (7th Cir. 2019) (explaining that "in the absence of a decision to which it could defer," a district court has "no choice but to review the claim de novo").

Here, there is no dispute that the Plan gives the Trustees the discretionary authority to determine benefits eligibility. However, because the plan administrator did not issue a timely decision regarding Nelson's claim for unreduced early retirement benefits, this court's review reverts back to a de novo standard. In particular, the eligibility committee specifically concluded that Nelson was not eligible for unreduced early retirement benefits, but the executive committee failed on review to issue *any* decision as to Nelson's retirement benefits claim; instead, the committee discussed only his claim for additional, retroactive disability benefits. Under ERISA regulations, a plan administrator must notify a claimant of the plan's benefit determination within 60 days after receipt of the claimant's request for review. 29 C.F.R. § 2560.503-1(i)(1)(i). Moreover, the Plan at issue mirrors this same requirement, stating that the executive committee must notify a participant of their determination within 60 days of the participant's request for review.

The administrative records shows that Nelson (through counsel) requested a review of the eligibility committee's denial of his claim for unreduced early retirement benefits on December 9, 2019. The record also shows that the executive committee *never* rendered a final determination as to that claim.[5] Accordingly, this court's review of Nelson's claim for

---

[5] Defendant contends that, "[b]y upholding the Eligibility Committee's decision without additional reasoning, the Executive Committee clearly indicated that it agreed Nelson became totally and permanently disabled in 2017." (Def.'s Reply (dkt. #25) 12.) However, there is nothing "clear" about this. The executive committee letter spends plenty of time explaining why it was denying Nelson's request for additional retroactive disability benefits, including reiterating the same reasons proffered by the eligibility committee. (AR vol. 1 at 45.) Under these circumstances, defendant's argument that the executive committee's complete silence as to Nelson's express request for review

unreduced early retirement benefits under the de novo standard.  *See Fessenden*, 927 F.3d at 1007 (remanding back to district court for de novo review of the plaintiff's claim where plan administrator failed to issue timely decision).

## C. De Novo Review of Denial of Unreduced Early Retirement Benefits

Turning then to the merits, the question before the court under the de novo standard of review is whether North Central's denial of Nelson's claim for unreduced early retirement benefits was correct.  *Olson v. Comfort Sys. USA Short Term Disability Plan*, 407 F. Supp. 2d 995, 1009 (W.D. Wis. 2005) (citing *Wilczynski v. Kemper Nat. Ins. Companies*, 178 F.3d 933, 935 (7th Cir. 1999)).  There appears to be no dispute that Nelson meets at least some of the eligibility requirements in that:  he had twenty years of continuous service prior to July of 2006; he had reached the age of 55 by the time he submitted his claim; and he was totally and permanently disabled at the time he submitted his claim.  Rather, the parties' dispute turns on whether Nelson's disability occurred within 36 months of the last month for which contributions were made on his behalf (referred to in this opinion as the "contribution requirement").  There is also a dispute over whether Nelson properly "applied for an Early Retirement Benefit on a form prescribed by or satisfactory to the Trustees" (referred to in this opinion as the "application requirement").  Thus, the court addresses each requirement below.

---

of his claim for unreduced early retirement benefits somehow means that they agreed with the eligibility committee's determination is wholly unavailing.

### 1. Contribution Requirement

Plaintiff argues that he became disabled on July 11, 2006, after suffering a neck injury while lifting tiles at work.  Because July of 2006 was the last month in which contributions were made to the Plan on his behalf, if this onset date were correct, Nelson would satisfy the contribution requirement.  In contrast, defendant maintains the eligibility committee's determination that Nelson became disabled on July 18, 2017 -- the date that SSA found him to be disabled -- is the correct date, which would put him past the time in which he could satisfy the contribution requirement.  As set forth below, the undisputed evidence unambiguously establishes that Nelson met the contribution requirement.

First, North Central *itself* determined that Nelson met the contribution requirement in deciding his claim for disability benefits.  To qualify for disability benefits under the Plan, a participant must be deemed to have suffered from a total and permanent disability within 24 months of the last date that contributions were paid on his behalf to the Fund -- a more stringent requirement than the 36-month period required for unreduced early retirement benefits.  Thus, in approving Nelson's original application for disability benefits, North Central necessarily determined that he met the contribution requirement for unreduced early retirement benefits.

To reconcile this obvious inconsistency, defendant now takes the position that:

> The Trustees granted Nelson's disability pension application, though they concluded Nelson became totally and permanently disabled in 2017, because they ignored the Plan requirement that to qualify for disability benefits Nelson must have become totally and permanently disabled within 24 months of the last month for which contributions were payable on his behalf to the Fund; rather than because they found Nelson had become disabled by 2008 or earlier.

18

(Def.'s Reply (dkt. #32) 10.)   However, this position is completely unsupported by the record as there is *nothing* in the Trustees' grant of disability benefits suggesting that they waived the contribution requirement.   To the contrary, records showing North Central's disability benefits calculations suggest that defendant considered August 1, 2006, to be Nelson's disability onset date.   Thus, defendant's present argument appears to be nothing more than a post hoc rationalization to avoid an unfavorable determination.

Second, in addition to North Central's own determination, plaintiff's alleged onset date is amply supported by Nelson's medical record and his work history.   Indeed, Nelson produced four medical examination reports that unanimously certified his permanent disability status within the meaning of the Plan began in July 2006 due to chronic neck pain and related issues.   Additionally, contemporaneous medical records confirm Nelson's continued and consistent reports of pain and functional limitations.   The objective medical evidence includes imaging and physical exams, as well as attempted but unsuccessful treatment efforts.

While defendant emphasizes that Dr. Kiel and other medical experts opined that Nelson should be limited to sedentary work with various exertional restrictions, rather than limiting him from work entirely, the Plan does not consider "disability" in a vacuum. Rather, the participant's permanent physical and mental limitations must be assessed in the context of the labor market to determine whether he or she could engage in "any regular occupation or employment for remuneration or profit."   By way of example, under the Social Security Act, individuals limited to sedentary work may be found to be disabled in light of their age, education, and previous work experience.   20 C.F.R. Pt. 404, Subpt. P,

19

App. 2 § 201.00 (medical-vocational guidelines).  Thus, the sedentary limitations provided by Nelson's treatment providers in 2006 and 2007 do not contradict the more specific conclusions in the medical examination reports finding Nelson permanently disabled within the meaning of the Plan.

Third, Nelson's inability to maintain a regular occupation is borne out by the record. Despite his expressed desire to continue working, the most Nelson could manage was limited work for his father's business.  Even assuming that defendant is correct that Nelson earned between $5000 and $8000 per year from this work, that amount fell well short of "employment for remuneration or profit" within the meaning of the Plan.  Specifically, the SPD explains that a participant engages in employment for reasonable remuneration or profit if his income equals or exceeds 2,080 hours of wages at the federal minimum wage, and the federal hourly minimum wage was $5.15 in 2006, $5.85 in 2007, $6.55 in 2008, and $7.25 in 2009 to 2017.[6]  Thus, Nelson would have to earn $10,712, $12,168, $13,624, and $15,080 per year, respectively, to have engaged in employment for remuneration or profit.

Finally, defendant hangs its hat on the onset date determined by the SSA, but it is undisputed that this date was chosen by *Nelson* in order to be considered "an individual of advanced age on the established disability onset date," thereby making it easier for him to qualify for SSDI benefits under an entirely different standard than the Plan's.  42 U.S.C.

---

[6] As defendant points out, case law holds that "if the plan and the summary plan description conflict, the plan controls." *Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Haynes*, 966 F.3d 655, 659 (7th Cir. 2020), *cert. denied*, No. 20-1150, 2021 WL 1602660 (U.S. Apr. 26, 2021).  Here, however, there is *no* conflict as the SPD's definition of "employment for remuneration or profit" is entirely compatible with the Plan, which lacks any definition.

§ 416(i) (Under the Social Security Act, "disability" is defined as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."). Accordingly, the SSA's decision confirms only that Nelson *remained* permanently disabled as of July 18, 2017, and has little bearing on whether Nelson was disabled under the Plan before that date.

### 2. Application Requirement

As noted, the parties also dispute whether Nelson properly applied for unreduced early retirement benefits under the Plan, which requires a participant to have "applied for an Early Retirement Benefit on a form prescribed by or satisfactory to the Trustees." According to defendant, "form" means a "printed or typed document with blank spaces for insertion of required or requested information." Because the administrative record contains no such form as to Nelson's claim for unreduced early retirement benefits, defendant maintains that he cannot meet the application requirement.

This is again an overly technical, narrow definition that would seem unworthy of a fiduciary, especially having failed to identify an actual printed form, much less proper notice to Nelson and other claimants of its required use. Regardless, "form" can simply mean a "procedure" or "method." *See* "Form," Black's Law Dictionary (11th ed. 2019). And there is nothing in the Plan itself that signals defendant's proposed interpretation should control. More importantly, if Nelson did in fact need to complete some additional, fill-in-the-blank form, North Central was obligated under ERISA to inform him of this. Specifically, the ERISA regulations state that "the plan administrator shall provide a

21

claimant with written or electronic notification of any adverse benefit determination," which must set forth, among other things, "[a] description of any additional material or information necessary for the claimant to perfect the claim *and* an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503-1(g)(1)(iii) (emphasis added).

As already discussed above, here, defendant actually admitted in writing that Nelson made a "claim" for unreduced early retirement benefits, and in response, the eligibility committee acknowledged his claim, denied it on the basis that Nelson allegedly did not meet the contribution requirement, and at *no* time indicated to Nelson that additional materials were required to perfect his claim. The ERISA regulations "are designed to afford the beneficiary an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial," including to "enable the claimant to prepare adequately 'for any further administrative review, as well as appeal to the federal courts.'" *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992) (quoting *Matuszak v. Torrington Co.*, 927 F.2d 320, 323 (7th Cir. 1991)). Accordingly, the court will not now uphold defendant's denial of benefits on the grounds that Nelson failed to satisfy a form requirement that was neither made available by the Plan nor communicated to Nelson.

### D. Remedy

For all the reasons discussed above, the court concludes that North Central's denial of benefits was incorrect and cannot stand. This leaves only the issue of the proper remedy. The Seventh Circuit has explained that:

> Generally, when a court or agency fails to make adequate findings or fails to provide an adequate reasoning, the proper remedy in an ERISA case, as well as a conventional case, is to

22

> remand for further findings or explanations, unless it is so clear
> cut that it would be unreasonable for the plan administrator to
> deny the application for benefits on any ground.

*Tate v. Long Term Disability Plan for Salaried Emps. of Champion Int'l Corp. No. 506*, 545 F.3d 555, 563 (7th Cir. 2008) (internal quotations omitted). Based on the defendant's own findings, dubious arguments for upholding the denial and the undisputed facts of record, the court finds this to be one such "clear cut" case. Indeed, North Central *itself* already determined that Nelson met the contribution requirement by initially finding him eligible for disability benefits based on an August 1, 2006, disability onset date. There is no reasoned basis to permit defendant to use a 2006 disability date for his disability benefits application, but then employ a 2017 date for his early retirement benefits application.[7] What's more, Nelson's work history, medical evidence and unambiguous findings of the medical experts overwhelmingly point to a date in July of 2006 on which he became totally and permanently disabled as defined by the Plan.

As to the application requirement, although defendant alluded to a "form" that it contends Nelson should have filled out, it has never been produced, nor has defendant ever pointed to any other substantive piece of information that it needs, but does not have, to assess Nelson's disability. To the contrary, the record contains more than sufficient information to confirm that Nelson meets all of the Plan's substantive requirements for unreduced early retirement benefits. Accordingly, the court concludes on de novo review

---

[7] Unfortunately, in a flawed attempt to reconcile this inconsistency, defendant has also brought a counterclaim seeking to walk back its award of retroactive disability benefits to Nelson. However, as discussed below, this award was not contrary to the terms of the Plan and defendant's transparent attempt to revisit its determination will be denied.

that an outright award of benefits is appropriate in this case.  *See Holmstrom*, 615 F.3d at 778-79 (awarding benefits where plan administrator had previously determined that plaintiff was disabled and where the record provided the court with a "firm grasp of the merits of the participant's claim"); *Halpin v. W.W. Grainger, Inc*., 962 F.2d 685, 697 (7th Cir. 1992) (affirming reinstatement of disability benefits).

## II. Defendant's Counterclaim

Finally, as alluded to, the court's rulings on the parties' motions still leaves defendant's counterclaim unaddressed.  In its counterclaim, defendant seeks a return of the disability benefits payments North Central already made to Nelson.  This claim is purportedly brought under ERISA § 502(a)(3)(B), which permits fiduciaries of a plan to seek "appropriate equitable relief . . . to enforce . . . the terms of the plan."  ERISA § 502(a)(3)(B) (codified at 29 U.S.C. § 1132(a)(3)(B)).  As suggested by the plain language of the statute, however, an ERISA fiduciary may obtain only *equitable* relief to enforce the terms of a plan.  *Sereboff v. Mid Atlantic Medical Services, Inc.*, 547 U.S. 356, 361-62 (2006); *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002).

An example of a scenario in which a plan fiduciary might seek relief under this section would be a request for reimbursement for medical expenses under a subrogation clause after a participant has recovered money from a third party for his injuries.  *E.g., Montanile v. Bd. of Trustees of Nat. Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 138 (2016).  Similarly, an ERISA fund might be permitted to recover from persons unjustly enriched by the fund's negligent overpayment of funds.  *E.g., Luby v. Teamsters Health, Welfare, & Pension Tr. Funds*, 944 F.2d 1176, 1186 (3d Cir. 1991).

Here, defendant contends that Nelson did not become totally and permanently disabled within the meaning of the Plan until 24 months after July of 2006, which was the last month for which contributions were payable to the fund on his behalf, and so, he was not actually eligible to receive *any* disability benefits under the Plan. As the court has already held, however, the administrative record compels a finding that defendant's original conclusion was in fact correct. Thus, defendant's counterclaim must necessarily fail as well, because the payment of disability benefits to Nelson was *not* contrary to the terms of the Plan, and defendant should not be permitted to revisit its reasonable determination just because it does not want to pay out more benefits.

Unfortunately, neither party expressly moved for judgment on this claim. However, the court is inclined to deny defendant's counterclaim *sua sponte* in an effort to put this case to rest because (1) it is directed only at the court's equitable powers, (2) it is directly intertwined with the issues already briefed by the parties, and (3) it borders on the frivolous. Still, since neither party really addressed this counterclaim in their submissions to date, the court will give defendant fourteen days to provide any additional evidence or briefing on the viability of its counterclaim in light of the court's subsequent rulings on the principal claims at issue.

## ORDER

IT IS ORDERED that:

1) The parties' stipulation to supplement the administrative record (dkt. #16) is GRANTED.

2) Defendant's motion for judgment on the administrative record (dkt. #18) is GRANTED IN PART and DENIED IN PART in that judgment is entered

against plaintiff and in favor of defendant as to plaintiff's claim for additional retroactive disability benefits and defendant's motion for judgment as to plaintiff's claim for unreduced retirement benefits is denied.

3) Plaintiff's motion for (partial) summary judgment is GRANTED (dkt. #20), thus entitling plaintiff to unreduced early retirement benefits prospectively, as well as a retroactive award of unreduced early retirement benefits commencing October 1, 2017, including interest.

4) Defendant's counterclaim is DISMISSED *sua sponte* by the court absent its submission of any additional evidence, proposed facts and legal argument on or before September 30, 2021.

5) Plaintiff may move for reasonable attorney's fees and costs once final judgment has been entered.

Entered this 16th day of September, 2021.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

26